**Tower Estate No. 3**

*William H. S. Wells* and *Herbert S. Riband, Jr.,* of *Saul, Ewing, Remick & Saul,* for accountants.

*Raymond K. Denworth, Jr.,* guardian and trustee ad litem, p.p.

SAYLOR, J., December 28, 1970.—This trust arises under the will of May 21, 1889, of Charlemagne Tower who died July 24, 1889. Under Item 5 of his will testator gave the residue of his estate in trust to pay after the death of his wife the whole net income in equal shares to and among his five children during their respective lives. At and after the decease of each of his said children, testator directed his trustees to pay the income to and among the child or children and issue of the deceased children of the child so dying per stirpes until such period as testator might prolong such distribution without violating the rule against perpetuities.

Testator gave each child and grandchild the power to provide by will for a surviving spouse for life to an extent not in excess of one-fourth of the income such child or grandchild would have received, if he or she had lived. There were further provisions as to ultimate disposition of the remainder by division of all the capital of the residuary estate among the lineal descendants then living 21 years after the death of the last survivor of "my above named ten children and grandchildren" living at the date of the will.

Testator's wife died long ago. All of his children have died leaving children and grandchildren, whose names and identification are set forth by the accountants in their statement of proposed distribution. . . .

In item Five of the will, testator, after giving the residue of his estate to his trustees in trust, em-

powered them "to invest and keep invested the same and every part of the capital thereof so as to make the same as productive as reasonably can be . . . , hereby directing them to preserve such investments and securities as I shall leave standing in my name so long as they, my said trustees or their successors in the trust, shall deem prudent, and making such new investment as they in their best judgment and discretion shall deem advisable and advantageous to my estate without confining themselves to such investments as the law directs for the investment of trust funds, hereby allowing them full power to select any investments or securities they may approve except the capital stocks of corporations and obligations not accompanied with reasonable securities."

Section 18 of the Fiduciaries Act of May 26, 1949, P. L. 1828, 20 PS §821.18, provided:

"In the absence, however, of an express restriction to the contrary in the trust instrument, the fiduciary may invest in any investment authorized by this act."

On February 19, 1954, Judge Bolger, auditing judge of the trustees' nineteenth account, in his adjudication, interpreted the above-quoted provisions of item Five of the will to authorize investment in the securities of business corporations. Exceptions to this adjudication were dismissed by unanimous opinion of this court written by the writer of this adjudication.

Thereafter, the trustees made numerous purchases of securities deemed legal investments within the Act of 1949, namely, common stocks, preferred stocks and debentures. In 1958, the Supreme Court decided Kelsey Estate, 393 Pa. 513; Jeffries Estate, 523 Pa. 523; and Saunders Estate, 393 Pa. 527. The trustees then filed their twentieth account for the purpose of ascertaining their position under the rulings in the aforesaid Supreme Court cases. The guardian and

trustee ad litem in that proceeding argued strenuously that the trustees were prohibited by the will from investing in the stocks of corporations. Nonetheless, Judge Lefever, in his adjudication of April 1, 1960, followed this court's opinion of 1954 and allowed the trustees to continue to hold corporate or "capital stock." No exceptions were filed to that adjudication.

In 1962, the Supreme Court decided Brown Estate, 408 Pa. 214, which raised further doubts as to the investment powers of the trustees. The trustees thereupon filed their twenty-first account in an effort to resolve these doubts. By his adjudication of July 29, 1964, Judge Shoyer, citing Henry Estate, 413 Pa. 478, in which the Chief Justice held that "legal investments, under the language, scheme and intent of this will, means investments which are legal investments at the time purchased (or made)," held that the trustees had the power to hold investments which were legal under the Act of 1949 and refused to surcharge the trustees. Exceptions were filed to this adjudication and argument heard. On December 18, 1964, the court en banc in an opinion written by Judge Lefever reaffirmed our holding of 1954 and refused to interfere with the trustees' right to invest in common and preferred stock. The court noted that a reversal of our 1954 holding would impose a greater hardship on the beneficiaries of the trust and would greatly hamper the trustees in their efforts to achieve further growth of trust principal.

At the audit of the account now before me, counsel for the trustees stated that they wanted approval to continue the investment policies authorized by our ruling in 1954.

In his opinion of December 18, 1964, twenty-third account, Judge Lefever noted that this case is sui generis and in rejecting the application to overturn the trustees' power to invest in corporate stocks said,

". . . this Court should not reach a decision with such untoward consequences, unless the language in the testator's investment powers viewed in light of Supreme Court decisions, clearly, precisely and indubitably requires that result." The thorough and painstaking examination of the investment powers set forth in this will on the numerous occasions it has been before this court have made it clear that this clause is ambiguous and subject to doubt. Certainly, it does not constitute "an express restriction to the contrary" within the meaning of section 18 of the Act of 1949. The investment policies followed by the trustees since 1954 are approved and their continuance is authorized.

Raymond K. Denworth, Jr., Esq., was appointed guardian ad litem for minors and trustee ad litem for unborn and unascertained persons by decree signed by me April 3, 1970. He has filed his report in which he has reviewed at length the administration of this trust and finds the same satisfactory. He has dealt at length with the legal issues arising from the investment powers of item Five of the will and the decisions of this court. He agrees that the trustees of the estate should continue to be permitted to invest in shares of the capital stock of corporations and does not consider it to be in the interests of his wards for the trustees to be prohibited the flexibility of investing in the stock of corporations when appropriate. . . .

*Henry Sill Bryans, Lewis H. Van Dusen, Jr., Drinker, Biddle & Reath,* for exceptants.

*Herbert S. Riband, Jr., William H. S. Wells, Saul, Ewing, Remick & Saul,* contra.

## SUPPLEMENTAL ADJUDICATION

SAYLOR, J., May 4, 1973.—On February 27, 1970 the trustees filed an account, being the twenty-

second account of the trust, by reason of the death on March 28, 1969, of William Fulton Kurtz, one of the cotrustees, and on December 28, 1970, I filed an adjudication confirming the account nisi. The accounting was of the fund awarded to the accountants in trust by an adjudication of Judge Shoyer dated July 29, 1964, and was stated for the period April 9, 1965, to December 11, 1969. Pursuant to the provisions of the will, the surviving trustees by writing dated March 26, 1969, appointed Alfred W. Putnam as cotrustee. Accordingly, I awarded the balance of principal as shown by the account to The Fidelity Bank, Alfred Putnam and Alfred W. Putnam, trustees.

Thereafter, Alfred Putnam, cotrustee, died on March 15, 1971, before the accountants had completed transfer of the trust assets to the then current trustees. By writing dated January 10, 1973, pursuant to the provisions of the will, the surviving trustee appointed Whitney Tower as cotrustee.

To avoid the expense of another accounting, the remaining trustees petitioned the court to open the adjudication filed on December 28, 1970, so that the accounting could be brought up to the date of Alfred Putnam's death and that the balance of principal could be reawarded to the trustees presently in office. My adjudication accordingly was opened.

At the audit several questions outside the scope of the petition were presented. All of these questions, however, were disposed of by agreement, except one. . . .

In addition to these questions, Tripp Tower and Annette Tower Ragsdale, the adopted children of Geoffrey Tower, deceased, presented claims for shares of the income previously paid to their adoptive parent. Although these claims are beyond the scope of the petition to open my adjudication, which has long since

become absolute, in the absence of any objection I shall consider them as if they had been presented at the original audit of the present account.

Testator gave the residue of his estate in trust, to pay the income, after the death of his wife, to his five named children, grandchildren and their respective lineal descendants for 21 years after the death of the last survivor of his children and five named grandchildren. His granddaughter, Grace T. P. Bright, who died on April 4, 1970, was the last survivor of the named lineals, and the trust continues for 21 years after the date of her death.

Geoffrey Tower, a grandson who was receiving 5/48ths of the trust income, died on March 26, 1957, survived by two natural children, Charlemagne Tower and Helen Tower Brunet, and by two adopted children, Tripp Tower and Annette Tower Ragsdale, and at a prior audit Judge Lefever, by a supplemental adjudication, decided that the adopted children of Geoffrey Tower were not income beneficiaries within the language of testator's will and awarded the entire share of Geoffrey Tower to Charlemagne Tower and Helen Tower Brunet, his natural children.

Exceptions to Judge Lefever's supplemental adjudication thereafter filed were dismissed by the court en banc in an opinion by Judge Bolger (Tower Estate, 27 D. & C. 2d 114, 128), and on appeal, the Supreme Court decided that the claimants did not come within the class of income beneficiaries designated in the will and affirmed the decree of this court: Tower Estate, 410 Pa. 389 (1963).

By reason of the recent opinion filed on November 17, 1972, in Tafel Estate, 449 Pa. 442 (1972), Tripp Tower and Annette Tower Ragsdale have renewed their claims and contend that they are each entitled to one-fourth of the Geoffrey Tower share of income.

Claimants are the natural children of Geoffrey Tower's wife, Annette Tower, now deceased, by a prior marriage, and were adopted by him on September 13, 1941. At the time of their adoption Tripp was 21 years of age and Annette 18. Because of the age limitation in Tafel the auditing judge deems it appropriate to state that he has no reason to believe that Geoffrey Tower's adoption of the claimants was designed to bring them within the provisions of testator's will. The claimants were the natural children of Geoffrey Tower's wife, Annette, by a prior marriage, and their adoption by him would seem to be consonant with his marriage to their mother.

The auditing judge must disallow the claim for two reasons: (1) It is clear from the language of the will that testator (as was his right) limited the beneficiaries of income and principal to his blood descendants, and (2) that the question of law involved is res judicata, the law of the case having been established by the Supreme Court in Tower Estate, 410 Pa. 389 (1963).

Adverting to the will, testator, in fixing the term of the trust, states (item 4) that he has 10 *lineal* descendants and names five children and five grandchildren. He then directs that the trust shall continue for 21 years after the death of the last survivor of the named lineals.

In disposing of the trust income, testator pertinently provides (item 5), upon the decease of any of his children, that ". . . the share of income which may accrue to any of my grandchildren or more remote *lineal descendants* under this my will . . . shall in like manner accrue to their children and issue of deceased children."

Finally, upon termination of the trust, testator directs that the principal shall be divided ". . . among all my *lineal descendants* then living, to each an equal

fractional share thereof without regard to their stock or the degree of their *descent from me."* He then declared (item 12) that distribution of the trust income ". . . to his wife, children and more remote *lineal descendants* . . . under the provisions of this my will shall be made in equal quarter yearly installments." (Italics supplied.)

It would seem unnecessary for the auditing judge again to construe the language of testator's will. In Tower Estate, 410 Pa. 389, 393, supra, the Supreme Court stated:

"After a careful examination of the will of this testator and the authorities cited in the excellent briefs submitted by appellants and appellees, we find ourselves in full agreement with the conclusion reached by the auditing judge and confirmed by the court en banc: '. . . , the instant testator's will controls the controversy. His meaning must be determined from his will in the light of the law in effect on July 24, 1889. His will begins with words of blood, vis., "children", "grandchildren", "issue" and "lineal descendants", and closes with "descent from me", also words of blood. It is inescapable that testator, by the language he used, intended to include only relatives of his blood and to exclude strangers to the blood, as subsequent takers of income on a grandchild's death. [The adopted children], therefore, are not entitled to share.' "

Claimants contend that the Tafel decision mandates unless a testator explicitly excludes adopted persons in a gift to others than his own child or children, that such adopted persons must be included. Such is not the case.

In Tafel, the court construed the word "children" to include the adopted child of testator's son, Adolph, in a gift of corpus to the children of Adolph "in the absence of any testamentary language demonstrating

a contrary intent." It stated that under prior case law, in the absence of such language, the courts presumed that testator intended to exclude adopted children. In Tafel, the court reverses the presumption and holds, in the absence of such language, that it is presumed testator intended to include adopted children.

In the instant case, the language of the will compels the conclusion that testator intended to limit the trust income to his blood relatives. His use of the expression "descent from me" and his repeated use of "lineal descendants" as beneficiaries clearly demonstrate that such was his intention. It was not necessary for the Supreme Court, nor is it now necessary for the auditing judge to resort to any presumption to ascertain testator's intent.

Again, for the second time, the claimants ask this court to construe testator's will and decide that the gift of income to testator's lineal descendants is not limited to his blood relatives and includes them as adopted children of Geoffrey Tower. In 1963, they raised the same question at a prior audit, and after careful consideration, this court, in an opinion affirmed by the Supreme Court (Tower Estate, supra) decided that the claimants were not lineal descendants of testator and, therefore, did not come within the class of income beneficiaries designated in the will. Having affirmed the decree of this court entered in 1963, the decision is res judicata of the question and is forever and under all circumstances final and conclusive: Wallace's Estate, 316 Pa. 148 (1934).

Since the Supreme Court has ascertained testator's intent from the language of his will, and decided that he did not intend that adopted persons should share in the trust income, the pole-star has been attained in the interpretation of his will and no further analysis or discussion of the language or its meaning is permissible.

It is the duty of this court to adhere to the Supreme Court's prior decision in this case. Accordingly, the claims of Tripp Tower and of Annette Tower Ragsdale are dismissed.

The account and its supplements show a balance of principal of $6,068,214.08, which, composed as indicated, is reawarded, as follows: To William H. S. Wells, Esq., of Saul, Ewing, Remick and Saul, Esq., $10,000 counsel fee; and the balance is awarded to the Fidelity Bank, Alfred W. Putnam and Whitney Tower, trustees, for the uses and purposes of the trust, and upon compliance with this adjudication William Fulton Kurtz and Alfred Putnam and their estates are discharged as cotrustees.

The account and its supplements show a balance of income, less distributions, of $52,926.31, which, less $700 to the estate of Alfred Putnam, deceased, to reimburse him for clerical expenses, is reawarded in accordance with the original adjudication, except that of income since March 15, 1971, the date of death of Alfred Putnam, 1/30th is awarded to Alfred W. Putnam and 1/30th to Richard C. Putnam.

Leave is hereby granted to the accountants to make all necessary transfers and assignments.

The certificate of the official examiner of his examination of the assets awarded in further trust will be submitted, and when approved, will be annexed and form part of this adjudication.

And now, May 4, 1973, the account and its supplements are reconfirmed nisi.

Before Klein, A. J., Saylor, Shoyer, Pawelec and Silverstein, JJ:

C. KLEIN, A. J., July 2, 1973.—The law in this State with respect to the inheritance rights of adopted

children has been drastically changed in recent years by our Supreme Court. See Tafel Estate, 449 Pa. 442 (1972).

If the instant case arose now for the first time, the claim of the adopted children might be decided differently. However, the precise language in this will, which is the subject matter of this litigation, has been construed by the Supreme Court against the position taken by the exceptants in Tower Estate, 410 Pa. 389 (1963). We are bound by that decision.

Accordingly, the exceptions are dismissed and the adjudication is confirmed absolutely.